**Dr. Paul KURTZ, Plaintiff,**

v.

**Ralph E. KENNICKELL, Jr., et al., Defendants.**

**Civ. A. No. 84-2918.**

United States District Court, District of Columbia.

Nov. 26, 1985.

As Amended Dec. 3, 1985.

Ronald A. Lindsay, Washington, D.C., for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., Brook Hedge, Sandra M. Schraibman, Stephanie L. Golden, Attys., U.S. Dept. of Justice Civil Div. Washington, D.C., for defendants.

Michael Davidson, Senate Legal Counsel, Ken U. Benjamin, Jr., Deputy Senate Legal Counsel, Morgan J. Frankel, John C. Grabow, Asst. Senate Legal Counsel, Wash-

ington, D.C., for amicus curiae, U.S. Senate.

## MEMORANDUM

OBERDORFER, District Judge.

### I.

Plaintiff, alleging that he is a federal taxpayer and a secular humanist, here sues the Public Printer, the Secretary of the Treasury, and the Treasurer of the United States. He alleges that their use of appropriated funds to print and publish annual compilations of prayers offered by the Chaplains of the Senate and the House of Representatives violates the Establishment Clause of the First Amendment. Plaintiff originally sought an injunction and a declaration that the practice of printing and binding the Chaplains' prayers is unconstitutional. He has, however, now withdrawn his prayer for injunctive relief and seeks only a declaratory judgment. Transcript of Proceedings (Tr.) of October 11, 1985 at 14.

Defendants have moved to dismiss or, in the alternative, for summary judgment. Plaintiff has opposed this motion and filed a cross-motion for summary judgment. Counsel for the Senate has filed helpful briefs as *amicus curiae*. The motions have been fully briefed and argued.

Since 1929, the Senate has regularly authorized, and the Congress has appropriated, funds which have been used by the Government Printing Office (GPO) to print, publish and distribute annually approximately 2,000 books of compilations of prayers offered by the Senate Chaplain. Defendant's Statement of Material Facts As To Which There Is No Genuine Issue (DSMF) at ¶¶ 7, 8, 13 (filed Feb. 1, 1985). The prayers printed are mostly those offered at the opening of each Senate session. Some were offered at special events elsewhere. Plaintiff's Statement of Material Facts As To Which There Is No Genuine Issue (PSMF) at ¶ 2 (filed March 15, 1985) [1]

From 1913 to 1916, and 1927 until 1978, the defendants also printed and published similar compilations of prayers offered by the Chaplains of the House of Representatives, but no compilations of prayers by the House Chaplains have been printed since 1978. DSMF at ¶¶ 3, 6.

As a result of the most recent authorizations,[2] the Public Printer has printed 2,338 copies of the Senate Chaplain's prayers in two volumes at a cost of $20,414.36. DSMF at ¶ 12. The three preceding printings cost $26,695, $29,847 and $21,364. PSMF at ¶ 4. Some of these volumes have not yet been distributed. Declaration of John W. Morris, Assistant Superintendent, Congressional Printing Management Staff, GPO at ¶ 4 (filed April 12, 1985); Supplemental Declaration of John W. Morris at ¶¶ 2–5 (filed Oct. 11, 1985). Those distributed have gone to a prescribed category of distributees: the Library of Congress, the National Archives, international libraries, the House and Senate Library, and to Depository Libraries. DSMF at ¶ 14 (citing 44 U.S.C. §§ 1718, 1714, 1719, 701, 1901–1914, respectively). A number of copies go to various Executive departments and agencies, and other governmental entities. DSMF at ¶¶ 17, 18. Congressional members and the Chaplains receive a few. DSMF at ¶¶ 19–21. About 100 are printed for emergencies. DSMF at ¶ 20. The volumes are not for sale, DSMF at ¶ 22, but there is evidence that copies are available to members of the public without cost from several sources. PSMF at ¶ 3; Opposition to PSMF ¶ 3.

The volumes contain primarily prayers offered on the floor of the Senate. They also contain some introductory remarks by public officials. PSMF at ¶ 5; Opposition to PSMF at ¶ 5. For example, the volume published in 1946 included a statement that its purpose was to make the prayers of Chaplains available to "large numbers of

---

**1.** Defendants oppose certain statements in plaintiff's statement of material facts. Opposition to Plaintiff's Statement of Material Facts As To Which There Is No Genuine Issue (Opposition to PSMF) (filed April 12, 1985). To the extent of

defendants' opposition, the facts are at issue and thus not relied upon in this Memorandum.

**2.** S.Res. 375, 376, 98th Cong., 2d Sess. (1984) (printing of compilations for the 97th and 98th Congresses).

our citizens" and to make "a valuable addition to the religious literature of our day." PSMF ¶ 5 (citing Prayers Offered by the Chaplain Rev. Frederick Brown Harris, S.Doc. No. 204 (1946) at ix, xi). Similar statements have been made in the introduction of other volumes. *See* Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss or in the Alternative for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment (Plaintiff's Mem.) at 34–35 (filed March 15, 1985). In supplemental submissions, defendants show that printing of the Senate prayer volumes for both the 97th and 98th Congresses has been completed and that all that remains to be done pursuant to the 1984 Resolution is to include 509 unbound and untrimmed volumes in the serial set consisting of all congressional documents published during the 98th Congress. Morris Declaration at ¶ 4.

## II.

### A.

Defendants first raise a jurisdictional concern. Defendants' motion alleges that plaintiff lacks standing to bring this action for several reasons. First, defendants argue that plaintiff lacks standing as an individual because he fails to allege concrete and particularized injury, and fails to meet the causation and redressability requirements of standing. Second, defendants argue that plaintiff has no standing as a taxpayer because (a) the expenditures were not made on authority of Congress' spending power under Article I, § 8, cl. 1 of the Constitution; (b) the challenged spending powers do not constitute a federal spending program; and (c) the amounts involved are insubstantial and are incidental to Congress' authority to conduct its internal operations.

 Defendants' challenge to plaintiff's standing, however, must fail. Our Court of Appeals' last word on this subject recognized the standing of a taxpayer to challenge the use of appropriated funds in violation of the Establishment Clause. *Murray v. Buchanan,* 720 F.2d 689 (D.C.

Cir.1983) (en banc); *see also Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 3332 n. 4, 77 L.Ed.2d 1019 (1983); *Katcoff v. Marsh,* 582 F.Supp. 463, 467–71 (E.D.N. Y.1984), *aff'd in pertinent part,* 755 F.2d 223 (2d Cir.1985). These decisions demonstrate that a taxpayer retains standing to challenge the use of appropriated funds in ways that violate the Establishment Clause of the First Amendment. *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

Defendants' reliance on *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), is misplaced. The taxpayer plaintiff in that case challenged Congress' exercise of its power under Article IV of the Constitution to convey surplus federal property, the maintenance of which was depleting the Treasury and increasing taxpayers' burdens. Here, the plaintiff relies upon a taxpayer's interest in the disposition of appropriated funds pursuant to Congress' spending power under Article I, § 8, cl. 1.

Defendants also contend that the *Flast* doctrine is inapplicable because the expenditures here are *de minimis* and not part of a "spending program." But, in a literal sense, expenditures of up to $30,000 per year since the 1920's is a spending program. Moreover, there is no significant difference between the amounts expended here and the expenditures for a Chaplain's salary, at issue in *Murray, supra.* The Court of Appeals' recognition of standing in that case forecloses defendants' challenge to plaintiff's standing here based on the size and continuity of the expenditures.

Defendants also challenge plaintiff's standing as an individual. But, whether or not plaintiff is a secular humanist, he is also a federal taxpayer. While plaintiff's interest as a skeptic about religion explains the motive for his challenge to the publication of the prayer volumes here, it does not detract from his taxpayer standing. In view of the clear precedent supporting plaintiff's claim to standing as a taxpayer, it is unnecessary to resolve the hypotheti-

cal questions which would be raised if taxpayer standing did not exist.

#### B.

On the merits, defendants urge that the printing and publishing of the prayer volumes neither advances religion nor involves excessive entanglement of government with religion. Defendants contend that since the Supreme Court has ruled in *Marsh, supra,* that the rendering of opening prayers in a legislature does not violate the First Amendment, "gathering those prayers into one volume cannot transform otherwise legitimate activity into an establishment of religion by the government." Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss or in the Alternative for Summary Judgment (Defendant's Mem.) at 46 (filed February 1, 1984).

As to secular purpose, defendants cite *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), where the Supreme Court stated:

> The Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, but only when it has concluded that there was no question that the statute or activity was motivated wholly by religious considerations ... Even where the benefits to religion were substantial, ..., we saw a secular purpose and no conflict with the Establishment Clause.

104 S.Ct. at 1362 (citations omitted). They contend that the printing and publication serve Congress' secular purposes of providing convenient access to an account of part of the legislative day and of honoring the Chaplains who are officers of Congress.

Plaintiff responds that "on the merits, this is an open-and-shut case. Congress is spending public funds for the publication of prayer books." Plaintiff's Mem. at 32. He cites *Everson v. Board of Education,* 330 U.S. 1, 15–16, 67 S.Ct. 504, 511–12, 91 L.Ed. 711 (1947), for the proposition that the: 'establishment of religion' clause of the First Amendment means at least this: .... No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion.

Relying on the prayers themselves and statements in the prayer volumes as evidence of a religious purpose, plaintiff argues that it is unnecessary to determine whether publication of the books either advances religion or entangles government with religion.

Ultimately, plaintiff argues that the Supreme Court's decision in *Marsh, supra,* "was predicated on historical considerations entirely absent in this case," i.e., that "the Congress that drafted the first amendment also appointed congressional chaplains." Plaintiff's Mem. at 38; *Marsh, supra,* 103 S.Ct. at 3335. By contrast, plaintiff emphasizes that the publication practice is of relatively recent vintage, and was not practiced by Congress contemporaneously with the adoption of the First Amendment.

Answering defendants' contentions as to other constitutional bars to suit, plaintiff argues that because the prayers are printed for public distribution, review of the process is not prohibited by the Publication Clause. *Hentoff v. Ichord,* 318 F.Supp. 1175 (D.D.C.1970). As to the Speech or Debate Clause, plaintiff contends that the publication and distribution of the prayer volumes is not sufficiently "a part of the legislative process itself" to be protected. Plaintiff's Mem. at 28 (citing *United States v. Brewster,* 408 U.S. 501, 527–28, 92 S.Ct. 2531, 2544–45, 33 L.Ed.2d 507 (1972); *Gravel v. United States,* 408 U.S. 606, 626, 92 S.Ct. 2614, 2627–28, 33 L.Ed.2d 583 (1972); *Walker v. Jones,* 733 F.2d 923, 929 (D.C.Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984)). He cites congressional authority for the proposition that prayer by the Chaplain "is not a matter of business, but ... a matter of ceremony." Plaintiff's Mem. at 29 (citing 6 C. Cannon, *Precedents of the House of Representatives,* § 663 (1936)).

### C.

In addition to their lengthy arguments on the propriety of congressional prayer printings, defendants suggest, and the Senate urges, that prudential considerations should cause the Court, in its discretion, to decline to "intrude on the responsibilities ... of the coordinate branches." Defendants' Mem. at 36 n. 36 (citing *National Wildlife Federation v. United States*, 626 F.2d 917 (D.C.Cir.1980)); Defendants' Memorandum of Points and Authorities in Opposition to Plaintiff's Motion For Summary Judgment and in Support of Defendants' Motion to Dismiss or in the Alternative For Summary Judgment (Defendants' Opposition) at 4–9 (filed April 12, 1985). For, they point out, all but 509 copies of the previously published prayer volumes have been distributed; the 509 copies remain for inclusion in the serial set of all documents published during the second session of the 98th Congress; and there are no outstanding orders for the printing and binding of any other prayers of the Chaplains. Defendants' Opposition at 7. Defendants and the Senate urge that these facts, while not mooting the case, buttress their appeal for exercise of equitable discretion and the dismissal of the complaint.

Plaintiff originally responded that he does not challenge merely the most recent printing and publication—he challenges the practice, past, present and future. In this regard, plaintiff argued:

> [There is not] the slightest indication that these regularly recurring publications will suddenly cease. Neither Defendants nor their amicus have stated that they recognize the error of their ways; quite the opposite, they have vigorously defended the legality and appropriateness of the practice.

Reply Memorandum of Points and Authorities in Support of Plaintiff's Cross-Motion for Summary Judgment at 3 (filed April 29, 1985).

A hearing was held on October 11, 1985, on the parties' cross-motions. At that argument, in response to earlier inquiry by

the Court,[3] counsel for the Senate, as *amicus curiae*, addressed the possibility that plaintiff might obtain the relief he sought by a petition to the Senate for the redress of his grievances. Tr. at 46–54. He noted that in the 1850's "there were very lively petitions concerning the congressional chaplaincy in various parts of the country".[4] Tr. at 48; *see also* Tr. at 52–53. He pointed to Senate rules which contemplate the reference of such a petition to the relevant committees—in this case the Committee on Rules and Administration. Counsel further advised that the majority and minority leadership of that committee had given him a "broad authorization ... to represent to the Court that any petition with respect to the printing of the prayer would receive ... serious ... consideration." Tr. at 49. Counsel further represented that the chairman had come to a position "which would assure that certainly within this present Congress, if the Plaintiff or anyone else were to petition for that relief, [the petition] would receive the fullest attention of the committee." Tr. at 50. From this, the Senate counsel urged that "we're at a juncture in this particular case where the desireability [sic] of turning primarily and principally to Congress for determination of these matters is very strong." Tr. at 50. He urged the Court, in deference to the separation of powers principle, to defer consideration of the matter "until the Senate ... makes a fresh judgment through a fresh legislative action" that "there should be printing on some terms in the future." Tr. at 56. Senate counsel further suggested that rather than stay the proceedings so that the Senate was "[u]nder the gun" of the Court, the case should be dismissed without prejudice. Tr. at 57. Counsel pointed out that briefing is already complete so that in the event that the Senate decided to resume publication of volumes of Chaplain's prayers the case is in position for prompt decision by the Court. In addition, counsel undertook to advise plaintiff promptly of the introduction of a resolution for the printing of the prayers in any sub-

---

**3.** Notice to Counsel (filed September 6, 1985).

**4.** *See also Marsh, supra,* 103 S.Ct. at 3334 n. 10.

sequent Congress. Tr. at 58. At the hearing, plaintiff urged the Court to decide the case on the merits because these "are not questions that are to be confined to [the] political process." Tr. at 66.

A post-hearing memorandum on behalf of the Senate strongly urges that the Senate be provided with an opportunity to consider whether it will direct the printing of future collections of the Chaplain's prayers, and reiterates that, in the special circumstances here, the Court should dismiss the complaint without prejudice on prudential grounds. Supplemental Post-Hearing Memorandum of Amicus Curiae United States Senate (Supplemental Senate Memorandum) (filed Nov. 7, 1985). The post-hearing memorandum was supported by a copy of a statement on the floor of the Senate by Senator Charles McC. Mathias, Jr., Chairman of the Senate Committee on Rules and Administration and of the Joint Committee on Printing. 131 Cong.Rec. S14277 (daily ed. October 29, 1985). That statement (a copy of which is attached hereto) confirmed the representations made by the Senate counsel at the October 11 hearing. Senator Mathias announced that if the question of printing further collections of Chaplain's prayers arose during the present Congress, either on petition by plaintiff (or someone else) or in the form of a new resolution to authorize further printing, it would be explored fully by the committees which he chairs. He stated that he personally would oppose further printing of the prayers because, apart from the cost, the printing of the prayer compilations "risks detracting from the central purpose of the chaplaincies." *Id.* He concluded:

> I should emphasize that I am not questioning the constitutional right of the Senate to reprint portions of its daily proceedings. If the courts were to decide the merits of the plaintiff's challenge to the printing of Senate documents, the courts would be required to consider the delicate issue presented when a coordinate branch is asked to

enjoin the printing of congressional proceedings. In response to such a lawsuit, the courts must weigh the separation of powers restraints on judicial oversight of congressional printing. Within the Senate, however, we enjoy wide latitude to examine our own practices. We are the appropriate forum for resolving these problems. It is for this reason that I have decided I should advise the Senate about the issue and about my conclusion that we should terminate this recent and costly addition to an important historical tradition which is of great significance to us.

*Id.*

Plaintiff strongly opposes dismissal by exercise of equitable discretion. However, on the day he filed his response, he also filed a petition with the Vice President of the United States with the expectation that it would be referred to the relevant Senate Committee. He suggested in his petition that the Senate might well be able to act on it before a court decision could be announced. Plaintiff's new response cites, for the first time, the Court of Appeals' decision in *Gregg v. Barrett,* 771 F.2d 539 (D.C.Cir.1985). In that case, Members of Congress and private plaintiffs brought an action alleging that responsible congressional officials did not accurately portray congressional events in the Congressional Record. Our Court of Appeals approved dismissal of the complaint of Members of Congress by exercise of equitable discretion in deference to the separation-of-powers problems inherent in judicial involvement in the inner workings of Congress. It refused, however, to apply the doctrine of equitable discretion to dismiss the claims of private plaintiffs, i.e., persons who were not Members of Congress. 771 F.2d at 543–46. The *Gregg* Court emphasized that the congressional plaintiffs (unlike the private plaintiffs) had "at least two ways" to achieve their ends "through resort to the legislative process." *Id.* at 545.[5]

---

**5.** One avenue of relief was for the Members to convince other Members to insist on enforcement of existing rules. The other solution was

for the Members to urge their colleagues to adopt a "rule of verbatim accuracy" such as plaintiffs were asking the Court to mandate.

But, *Gregg* does not preclude dismissal of the complaint of the private plaintiff in the special circumstances here. In *Gregg*, the private plaintiff had neither filed a petition nor been the recipient of a committee Chairman's commitment on the public record to consider that petition. Moreover, in this case most of the acts of which plaintiff complains have already occurred—only 509 prayer volumes remain to be bound and trimmed and included in the serial set. Thus, the controversy, although "not actually moot," may be "so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant." *Chamber of Commerce of the United States of America v. United States Department of Energy,* 627 F.2d 289, 291 (D.C.Cir.1980). The fact that plaintiff challenges not only the specific printing at issue but also the entire *practice* of governmental prayer printing, does not dictate a different result in the particular circumstances presented here. As the Supreme Court has said in the context of review of challenged agency action:

> Declaratory judgment is a remedy committed to judicial discretion.... We think that sound discretion withholds the remedy where it appears that a challenged "continuing practice" is, at the moment adjudication is sought, undergoing significant modification so that its ultimate form cannot be confidently predicted.

*A.L. Mechling Barge Lines, Inc. v. United States,* 368 U.S. 324, 331, 82 S.Ct. 337, 342, 7 L.Ed.2d 317 (1961).

Here, the facts on the record in this case confirm that the Senate may well be prepared to address this issue on the merits, as it did similar issues in the 1850's. In this connection, it is noteworthy that the House of Representatives has not published its Chaplain's prayers since 1978, DSMF at ¶ 2, and there is no suggestion that renewal of the practice by the House is in prospect. If the Senate fails to act within a reasonable time, plaintiff's papers are in place and standing and jurisdiction have been adjudicated. Thus, plaintiff's complaint could be quickly reinstated and the issue resolved on the merits. Now, however, the availability of a forum in the Senate for fresh consideration of whether to print volumes of Chaplain's prayers makes it appropriate, in the unusual circumstances of this case, to defer to this coordinate forum. For, as Justice Powell has said:

> [H]ead on confrontations between the life-tenured branch and the representative branches of government will not, in the long run, be beneficial to either. The public confidence essential to the former and the vitality critical to the latter may well erode if we do not exercise self-restraint in the utilization of our power to negative the actions of the other branches.

*United States v. Richardson,* 418 U.S. 166, 188, 94 S.Ct. 2940, 2952, 41 L.Ed.2d 678 (1974) (Powell, J., concurring).

■ Accordingly, the Court will withhold declaratory relief for prudential reasons in this case. The accompanying order will dismiss the complaint without prejudice. *See National Wildlife Federation, supra,* 626 F.2d at 923.

### EXHIBIT A

#### Vol. 131

### CONGRESSIONAL RECORD—SENATE

#### S14277

*October 29, 1985*

### PERIODIC PRINTING OF THE CHAPLAIN'S PRAYERS

Mr. MATHIAS. Mr. President, pursuant to Senate Resolution 468 of the 98th Congress, the Senate Legal Counsel is appearing as amicus curiae in the name of the Senate in the case of Kurtz against Kennickell. The plaintiff in this litigation, which is pending in the U.S. District Court for the District of Columbia, is asserting that the printing of compilations of the Chaplain's prayers violates the establishment clause of the first amendment to the U.S. Constitution. The Senate is supporting the Department of Justice's constitutional defense

of the periodic printing by the Government Printing Office of collections of the prayers of the Senate Chaplain.

As chairman of the Committee on Rules and Administration and of the Joint Committee on Printing, and also as a member of the Joint Leadership Group with responsibilities concerning the Office of Senate Legal Counsel, I have a particular interest in this lawsuit. Both by statute and by Senate rule, the Committee on Rules and Administration is responsible for reporting to the Senate resolutions to order the printing of Senate documents. Under this authority, the committee reported and the Senate approved Senate Resolutions 375 and 376 in May 1984 to order the printing of the Senate Chaplain's prayers for the 97th and 98th Congresses. These resolutions provide that copy for these documents shall be prepared under the direction of the Joint Committee on Printing.

In Marsh against Chambers, decided in 1983, the Supreme Court sustained the constitutionality of the election and compensation of legislative chaplains. The Court carefully traced the history of the legislative chaplaincies, emphasizing that the First Congress, the same Congress which proposed the Bill of Rights to the States, also provided for the election by each House of a Chaplain who would be compensated together with the other officers of the Senate and House.

The printing of the prayers of the Senate and House Chaplains is of more recent origin. Although prayers were occasionally printed in the CONGRESSIONAL RECORD prior to 1911, the RECORD generally continued the practice, with some exceptions, of noting the delivery of prayers but not printing their texts. In 1911, the House directed that all the invocations of its Chaplain be printed in the daily RECORD, and the Senate followed suit in 1914. The first reprinting of the prayers of a congressional Chaplain occurred in 1913 when the House agreed to a resolution to print a volume of its Chaplain's prayers for the 62d Congress. The Senate defeated a proposal that year to print its own Chaplain's prayers. In 1927, the House again ordered the printing of a volume of its Chaplain's pray-

ers, and the Senate, 2 years later in 1929, for the first time ordered the printing of a volume of the Senate Chaplain's prayers. The House has not reprinted its Chaplain's prayers since 1978.

The question has arisen, in the case now pending in the district court, whether the Senate rather then the courts is the better forum for considering whether the Senate's recent practice of printing compilations of the Chaplain's prayers should be ended or modified. The plaintiff, as any other individual, has a right under the first amendment to petition the Government for a redress of grievances. The Senate in Standing Rule VII makes specific provisions for the receipt of petitions and for their referral to committees.

As chairman of the Committee on Rules and Administration, I would consider any petition on the subject of the printing of the Chaplain's prayers. There is historical precedent for plenary consideration by committees of the Congress of constitutional questions relating to the congressional chaplaincies. Between 1850 and 1854, committees in the Senate and House issued three reports in response to petitions from citizens to abolish the congressional chaplaincies. These reports concluded that the election and compensation of chaplains was a permissible practice under the Constitution, and the Supreme Court in the Marsh decision took specific note of the Congress' consideration of that issue.

Having already given the matter serious consideration, I have also concluded that I should not wait for a formal petition before expressing my personal conclusion that we should not provide for the printing of future volumes of the Chaplain's prayers. There is no standing provision for the reprinting of the Chaplain's prayers and a new resolution of the Senate is required for each order to the Public Printer for a new volume of prayers. If the Senate simply were to take no action, the recent printing practice would end. At the least, the issue should be explored fully prior to action on a subsequent printing resolution. As chairman of the committee with jurisdiction, I

would act to assure that consideration if the printing question were to arise during the present Congress.

My reason for reaching this conclusion is, briefly, as follows. The foundation of the congressional chaplaincies is their historical continuity, beginning in the colonial legislative assemblies, through the Continental Congress, and from the First Congress to the present. The contemporary strength of the chaplaincies lies in their original purpose of providing a solemn moment in which our collective thoughts are focused on the Chaplain's prayer for Divine guidance and blessing. I believe that we will best serve the historical institution of the congressional chaplaincies if we conclude that the printing of compilations of these prayers at public expense, a 20th century addition, risks detracting from the central purpose of the chaplaincies. In saying this I am not unmindful of the costs of printing. The Government Printing Office printed 2,045 copies of the compilation of prayers for the 98th Congress and estimates that the cost of that printing alone was $24,530. Of course, the daily prayers should continue to be printed in the CONGRESSIONAL RECORD where they are part of a full account of our daily proceedings.

I should emphasize that I am not questioning the constitutional right of the Senate to reprint portions of its daily proceedings. If the courts were to decide the merits of the plaintiff's challenge to the printing of Senate documents, the courts would be required to consider the delicate issue presented when a coordinate branch is asked to enjoin the printing of congressional proceedings. In response to such a lawsuit, the courts must weigh the separation of powers restraints on judicial oversight of congressional printing. Within the Senate, however, we enjoy wide latitude to examine our own practices. We are the appropriate forum for resolving these problems. It is for this reason that I have decided I should advise the Senate about the issue and about my conclusion that we should terminate this recent and costly addition to an important historical tradition which is of great significance to us.

ORDER

For reasons stated in the accompanying Memorandum, it is this 26th day of November, 1985, hereby

ORDERED: that plaintiff's complaint should be, and hereby is, DISMISSED without prejudice.